I'm Tammy Smason for the County of Los Angeles. In preparing for this argument, I noted that the briefs almost appeared to be like ships passing in the night, and it seems there's a dispute about what the issue is in the case. This case is not about the discretion of an agency to interpret its own regulation. There's no blank slate on which the agency gets to decide what the rational interpretation is. The situation here is that there was an interpretation of the briefs, but there wasn't an interpretation of the briefs. And I think that's what we need to do. There was an interpretation that was implemented for years that allowed the use of the figure of budgeted beds for the county hospital to determine the amount of reimbursement for indirect medical education. And then suddenly in 1994, without explanation, the application, interpretation and application changed. Ms. Smason, obviously that's true. But the interpretation was by Blue Cross. And if I got it right, obviously you were satisfied, so you didn't appeal it to the review board or to the secretary. So the operative interpretation up until Blue Cross changed its approach to license beds and then back to actual beds was just the intermediaries, which is not, I mean, it's binding in the sense of that's the decision unless it's appealed. But Blue Cross has no ability to make policy for the secretary. Well, that's true, except here Blue Cross wasn't just doing it kind of behind the scenes. They came up with an administrative resolution that was in correspondence that was copied to the secretary, copied to the PRRB. And there was no objection. Well, how would the PRRB have anything before it to deal with in those circumstances? It had the letter where the intermediaries said, this is what we resolve to do in this case. Yeah, and did it approve it or anything? It took no action. I mean, can it? Isn't it an agency that operates upon, you know, an objection to a cost determination? Well, it certainly could raise questions. I mean, the intermediary is the agent of the secretary. And if it sees these letters coming in, it could be referred to somebody. Questions could, there could even be correspondence, but we weren't privy to it because the PRRB refused to issue subpoenas that we asked for about what happened in those prior years. Again, okay. I just had trouble understanding what difference that makes. I understand the point that this was the fiscal intermediary and not the secretary. But as this Court said recently in Loma Linda, the fiscal intermediary is the agent of the secretary for. Sure, but we also said that not for purposes of making policy. And I don't think this was making policy. This was a rational interpretation of a regulation such as it was. I would charitably say it was an ambiguous regulation, but it was entirely consistent with the regulation. Counsel, we have cases where the agency has interpreted something one way for quite a while. Then they change their mind. And even in the situation where it's the agency, if they have a rational basis and it's not inconsistent with either the regulation or the statute, we tell them they can change their mind. That's true, Your Honor, but that's if they articulate it, if they have a rational basis and articulate it. And in this case, there was no articulation and there was no witness at the hearing who was even involved in the decision to change the position. And as Your Honor said in the law versus INS case, it's a settled practice that's changed without explanation is an arbitrary and capricious act. This was done without so much as even a modicum of an explanation. It was just done. And there are other cases that are cited at pages 9 to 10 of my brief, of the opening brief, that discuss the same idea, that an agency can't just sort of willy-nilly say one year this is going to be the way we do it and this year it's going to be the other way. There's also a case that was the county of Los Angeles versus Sullivan decided by this panel that was cited in the reply brief where the intermediary allowed the county to use what they called method A for a response. A number of years. And then suddenly it turned out method A wasn't as, in a particular year, it wasn't as advantageous to the program and so the secretary wanted to impose method B and I may have the two mixed up and I apologize if I do. But this court said no, the fiscal intermediary allowed the use of A and it's found by, it can't just change because it's now more financially appropriate or beneficial to the agency to use the other method. The defendant cited the case of Altoona, which I'd just like to mention briefly because I think, first of all, it's a Third Circuit case that was not published and said it's not presidential and so I'd like to point that out. But I think it sort of illustrates facts that are important because they're not present here. In Altoona, the Third Circuit said that the agency could interpret its regulation the way it wants to do it here. But there was no record of a history of having allowed the provider to do it a different way for many years. Yeah, but it referred, as I recall, specifically to the secretary or to having taken any prior litigation position or to a board determination. Yes. Not just to Blue Cross, who I think was the intermediary there, too. Yes, and it was. But the other significant issue there is that in Altoona, the provider could have used more beds if it hired more staff. Right. And here, while that's a theoretical possibility, it's a practical impossibility because this is a public hospital. There was no evidence or nothing discussed in Altoona that said there was a practical inability to hire more staff. Here we have that because of the way the county system works. So if there are no further questions, I'll reserve my time. May it please the Court, I'm John Cappell with the Appellate Staff Civil Division, U.S. Department of Justice, and I'm representing the Appellee Secretary of Health and Human Services on this appeal. The district court correctly granted summary judgment and upheld the secretary's eminently reasonable and longstanding interpretation and application of the available beds regulation that determines the amount of the indirect medical education expenses that a hospital is reimbursed for. I really have very little to add to the colloquy between the court and plaintiff's counsel and to our brief on this subject. I have a couple of questions. Sure. One, a procedural question, whether the secretary should be held to the practice of the intermediary. I assume that the secretary can't appeal, which may or may not be right, but that he can't appeal if there's an agreement between the provider and the, you know, between Blue Cross and the hospitals that he can't appeal. But if the secretary's aware of an ongoing practice, doesn't the secretary accept that practice and shouldn't that be treated differently from simply an agreement between those two non-parties that don't bind it? Well, Your Honor, there's, first of all, I'd point out that in the record there's no real, no indication that the secretary was aware of the practice here. There may be, plaintiff's counsel claims there may be copies that were sent to people, but that certainly doesn't mean that the secretary was actually aware of it or that anyone in the vast Medicare bureaucracy focused on it. But even if there were, even if the secretary were somehow aware, the secretary wouldn't be estopped by virtue of the intermediary's mistaken practice. And misapplication and misunderstanding of the secretary's policy. If the secretary was aware and over a period of time failed to say you're misapplying the policy, do you think that would have no effect? Well, it certainly wouldn't, as I said, it certainly would not be a basis for an estoppel. No, it wouldn't be an estoppel, as Ted Fletcher's mentioned. Of course, you can always change a policy. The question is then, it's a little different from doing it initially. But to move on to the merits of the case, as I understand it, if they had taken these beds that they were unable to use and put them on a separate floor in a separate part of the corridor and locked it and said, well, we can't use these beds, then they would have been all right. Yes, Your Honor, if they had made that type of showing that they'd actually taken the beds out of service. But even if you know that there's no way they can use the beds, as long as they're not put behind a locked door, then they're not entitled to the same relief? No, Your Honor, they can still make a showing, but they didn't make that type of showing here that they are simply unable to use those beds. All they're relying on here is their budget, and the figure, the formula isn't even explained, and their own witness stated that you can't derive the budgeted beds number from the budgetary amount. So the question then is, if they could show that they were not able to use these beds during the year, they would have been entitled to this compensation? Yes, Your Honor, if they could actually make that showing as opposed to simply relying on the budgeted beds figure that was not explained adequately in their claim. What would they have had to do beyond what their witness did, saying that the budget would not permit them without the staffing to use the beds? And I suppose the County Board of Supervisors could always pass a supplemental budget. Is there anything else that they failed to say? Well, for instance, if it were clear from a county ordinance or something that it were written in stone, the hospital could not... Well, no county ordinance could be written in stone. It could always be changed. Excuse me, Your Honor? I said an ordinance can always be changed. Well, that's true, Your Honor, but if there were an actual limitation, a hard and fast limitation that one could understand, where one could trace back the bed number to the budgetary figure, then the plaintiffs might actually, then arguably they could meet their burden, but there was no such showing in this case. Well, wasn't the budget figure supposed to be the maximum number of beds? It was supposed to be the maximum number of beds averaged out for the entire year. That is the county's position. But that's not the way the Secretary's regulation, as the Secretary has interpreted and applied it consistently, operates. The Secretary starts with the number of physically available beds, and then the burden is on the provider to make a showing that beds actually are not available. But it can't be done through the kind of purely abstract assertion that the county has made here. There has to be an actual, a real showing of specifics, and that is what's missing here. Well, didn't the county financial officer testify that there... Do you need to show this in advance, or is it enough to show that the actual fact was there was no staffing that would have allowed the use of the beds during that period? I'm not entirely sure I understand the difference on the... Well, the difference would be that in advance of the year in question, there were regulations by the county that would have prevented the use. The other alternative would be at the end of the year, the county financial officer says that at no time was there a budget sufficient to have permitted use of the beds. Well, I believe that basically the way this is, even though it's a prospective payment system, what we're looking at it retrospectively, and the county has to make the showing that throughout the period in question, the available beds were what it says. Well, I thought Mr. Runke testified that at no time during that year was there a budget sufficient to permit the use of the beds. Again, but that was an unsupported assertion, and the mere say-so isn't good enough. He testified that because of the proposed limits and the proposed budget... Well, not proposed. They couldn't exceed that average bed figure. But again, that's not sufficient. That's an unsupported assertion. There have to be really hard and fast facts, and those facts are not present in the record. Rather, Mr. Runke, he testified that you couldn't figure this out across, even within the same hospital, let alone across hospitals, to determine the actual, what the budgeted beds figure meant. So it was really essentially a moving target, and that's the problem. That's what the Third Circuit recognized in the Altoona case. This type of approach, unduly burdensome for the Secretary in administering this massive program. But also it's subject to manipulation by the hospitals, and that's why the Secretary has established the system that he has. Also, I'd point out that here that there's no dispute that they received reimbursement of capital costs on the full number of beds. So again, this is really trying to have it both ways. And that is what this regulation is designed to prevent. I'd also point out that with respect to the other regulations and programs, like the disproportionate chair hospital program and the rural referral center, we've shown that the Secretary's interpretation and application of those regulations is consistent here. But even if the court, if the plaintiff's approach were adopted, that could have very negative ramifications for those, for other providers in those hospitals who have the opposite interest, because their interest is in maximizing the number of beds for which they're receiving reimbursement. So this is something that cuts both ways, but the record clearly establishes that the Secretary's interpretation has been consistent and reasonable, and the Secretary is entitled to deference, maximum deference, about eight different ways here, since this is clearly an interstitial legislative regulation, and his interpretation isn't plainly contrary to the statute. And also, this is a Chevron 2 case, and also then to the extent that they're challenging the specific decision, it's not arbitrary and capricious or plainly contrary to the statute, and it's also supported by substantial evidence. So... And the officer testifies that we couldn't have utilized any more beds than what the budget specifies. Isn't that adequate evidence? No, Your Honor, with all due respect, it isn't, certainly, because, again, that's not the way the regulation is structured. The regulation establishes the presumption regarding the availability of beds based on the physical count. And that can be rebutted, but it has to be rebutted by a showing, including data, not merely the officers say so, that the beds are actually unavailable. Well, if we took Mr. Runkle's testimony, and that testimony was supported by documents that proved the testimony was correct, then would the county be able to use that evidence? Conceivably, Your Honor, yes. If the county were able to make a showing that it really couldn't use, couldn't exceed the figure, and that translated into the specific number of beds, then the hospital's number might well carry the day. But it didn't make any kind of showing like that here. Well, what I'm trying to find out, there are two different things. One is whether Mr. Runkle's testimony, if it were fully supported by documents, would be sufficient, or whether there are also gaps in Mr. Runkle's testimony that would prevent the county from prevailing. Well, I'm not sure. Substantive gaps, if there were things he didn't say, even if supported by documents. The whole, the premise was basically, well, it was wrong, because, and he was saying that essentially as a matter of law, this couldn't be, they couldn't exceed this number, and he was not making the showing. So there were gaps, and the premise was wrong, and there were gaps in the testimony as well. See, they're challenging both the regulation, basically globally, and also this particular decision, but both of the challenges failed, because the regulation is reasonable, and it was not misapplied here by the secretary, and there's substantial evidence supporting the secretary's decision. What I'm trying to find out is where they failed to show that, assuming the regulation is valid, where did they fail to show that? Where did they fail to show that the beds were actually unavailable? They failed to show, because they simply, they gave the budgetary figure, the budgeted beds figure, but they were unable to make the financial or economic connection between the number of, the amount that they claimed and the number of beds, and they were not, it was basically the same. It was basically impenetrable, and it was, again, simply the plaintiff's say-so, rather than an actual hard and fast showing of a real inability to use, to exceed the budgeted beds number, and they obviously did. The record does reflect that they exceeded it sometimes. It also reflects that sometimes in the past the hospital has taken beds out of service, so it could do that here, too, but it didn't, again, it was really a moving target. Well, the reason they couldn't take it out of service was because they could average it over the year. They could use the beds X number of days above their figure, as long as X number of days they used them below, as I understand it. Yes, again, but that is their premise. Well, that's their testimony. Well, that's their testimony, but it wasn't supported by numbers. They didn't make that showing, the showing that would have justified it. What do you mean by not supported by numbers, meaning that they didn't go and physically count the beds every day, or what? Well, that was their budgeted beds allocation, and the number of beds that they said was the average number that they couldn't exceed, and so they didn't... Well, the actual, the budget figure really affected the staff, which would be available for the beds. And you're saying that when they gave you a figure as to the maximum figure for the staff, they didn't prove that figure? That's correct, Your Honor, and I would point out that staff, that it's clear that the regulation is not geared, simply geared to patient, the number of patient days, or to staffing concerns, per se, than the Third Circuit recognized that in Altoona, as the Seventh Circuit also did in the Little Company of Mary case. This is geared to the size of the hospital. It reimburses based on the level of teaching intensity at the hospital, which goes to the hospital's bed size, rather than the actual number of patients that it takes care of over a given period. So that's the way the regulation is structured, and it's really, it is not designed to reflect simply the kind of the day-to-day life of the hospital. Day-to-day changes in staffing and number of beds. So that is the fundamental error that the plaintiffs have made here, in challenging the regulation, both on its face and as applied here. And it is clear from the record that the Secretary has interpreted this consistently, even if the fiscal intermediary might have been mistaken about the actual number of beds in this case, and also might, and erroneously looked to license beds in 1994, which is what triggered this controversy. So if there are no further questions, I would urge the Court to affirm the judgment of the District Court. Thank you, counsel. Mr. Runkle did testify that the number of beds is in the proposed budget, and that that and other work papers get wrapped up into the final budget, but the number of beds aren't reflected in the final budget. But the resources are allocated in the final budget. In other words, he said the final budget is an accountant's document, whereas the proposed budget is a planner's document. What is your response to the point basically accepted in the Third Circuit's disposition, and in the Seventh Circuit's opinion, that the object here is to measure teaching, education, and education. And not services provided or staffing availability. And that really the only, in effect, sensible way to implement a regulation of this sort throughout the country is to do a nose count. And the beds are hooked up, ready to go. IVs can be plugged in. Buzzer is there. And it can be used at any moment. I think that the budgeted beds figure does actually measure teaching intensity, because it is an average that's reflected throughout the year. It's a maximum average, rather. And so that reflects what the teaching intensity is. The fact that there are hundreds of beds hooked up with no patients in them and nobody to staff them should not play into the teaching intensity. Well, but why then shouldn't those beds simply, it just seems so easy, if that's going to be your consistent position, just to close off a wing. I mean, if that's the deal, why don't you just do that? Although this isn't in the record, I can only suppose that if there's a public health emergency, you know, to close off a wing. Things might change. And if there were, it would be full, and that's the answer. I mean, right there, you've just given it. They are available. They're available for use on a particular day or month, but the secretary's own regulations and council just said, we don't measure the day-to-day fluctuations. The regulation is an averaging. It says we count the number of available. If it's available on any given day, it's presumed available through the entire period. Yes, but it also says we take the total number of available bed days and divide by the number of days. Get right back where you started. But I think there is actually a practical limit on the beds, and there's evidence in the record to show that the emergency room was saturated on many, many days, and patients could not get to beds. Even though these beds were hooked up and there were IVs, there were patients sitting in the emergency room and ambulances being sent to other hospitals. So in a practical sense, these beds were not available. The hospital had to manage these figures so that they came out with the right maximum average. And the evidence in the record of the census, which was put into the record by the defendant in the supplemental excerpts of record, and it's page 12 of the supplemental excerpts of record, show that the census was lower than the number of available beds. This was the hospital managing annually to that number, which is really what the regulation contemplates. It seems odd that if it's teaching intensity that's supposed to be rewarded, why don't they count the number of doctors and the number of residents and let it go at that? That would be another way to do it. I guess the agency has the discretion there. One could argue that that's more subject to manipulation, I guess, and a doctor could be full-time or part-time, and so you'd really have to measure those things. So the difference between the proposed budget and the actual budget, I assume by the time this comes before the provider, you know the actual budget. Right. The actual budget is just a reflection of the dollar amount of everything, all the proposed budgets, all the source documents that were part of the proposed budget. The actual budget is the number that reflects the dollars to pay for those things. And if a proposed budget were rejected, then there would be a revised proposed budget. So the final budget is really an accumulation of all of the proposed budget documents. And the terminology is odd, and it's not, obviously, one of those things government does that isn't meant for lay people to understand. Correctional people. Well, yes. But the proposed budget for that year was never changed, and that means that was the number of beds that there was financing for, for linen, dietary, staffing, etc. So the proposed budget in layman's terms was the actual budget. That's right, unless it got changed by the time the final budget came. Which I assume it wasn't, or was it? It was not. Okay. All right. Thank you. There's one other point I'd just like to address that counsel said, and it was in the brief, that there was no dispute that the hospital was reimbursed for its capital costs of all the beds. And that's not true, and it's not in the record. And, in fact, the hospital was reimbursed for capital costs on a prospective payment basis, not based on the number of beds had nothing to do with its capital costs. And that regulation is at 42 CFR 412.324, which is the methodology for reimbursing capital costs. So I just wanted to make a point of contesting that. Thank you. Case just argued will be submitted. The court will stand in recess for the day. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.    Thank you. Thank you.
judges: Fletcher, Reinhardt, Rymer